Mr. Chief Justice ShaRkey
delivered the opinion of the court.
The appellee filed his bill in the superior court of chancery, to enjoin the sale, under executions, of certain slaves therein mentioned, and obtained a decree in his favor, from which the respondents below appealed.
The complainant claimed the slayes by a purchase from H. A. Moore, made on the 30th of April, 1839. The judgments, however, were older in date, and constituted liens, to avoid which, the complainant endeavors to protect himself under a deed of trust made by Moore, before the rendition of the judgments, by which the same slaves were conveyed in trust for the purpose therein mentioned.
The history of the transaction is as follows : In June, 1836, H. A. Moore and one Martin, purchased the slaves of John Henderson, giving him in payment four bills of exchange, one for the sum of $7853, and three others for the sum of $5000 each, drawn on a commercial firm in New Orleans, of which complainant Starke rvas a member, and by them accepted. To indemnify them for their acceptances, Moore and Martin conveyed the slaves to one Moise, in trust. This was the first incumbrance. The first bill of exchange, for $7853, was paid by the acceptors, and they were not indemnified for some time afterwards, and ultimately only by the note of Moore, who had purchased Martin’s-interest very soon after they purchased the negroes. This note was transferred by the commercial firm, to the Commercial Bank of Natchez, the complainant Starke being still liable thereon as indorser.
The other bills of exchange fell into the hands of Briggs, Lacaste & Co., who, it seems, were indebted to the Merchants *127 Bank of New Orleans. By a mutual arrangement between the parties, Moore undertook to pay the Merchants Bank the amount of the three bills for Briggs, Lacoste & Co. This he did by giving five notes, with the further security of a deed of trust on the same slaves, to Thomas Henderson, for the use of the bank. The bills were taken up, and Briggs, Lacoste & Co. credited by the amount of Moore’s notes. This was in August, 1838, but the deed was not recorded until December, 1838.
Prior to this arrangement, Moore had executed another deed of trust on these negroes to secure certain indorsers, who, however, relinquished their lien in favor of the bank. It would seem that the bank refused to consummate the arrangement until this relinquishment was procured.
On the 13th of April, 1839, Moore sold the negroes to Starkd. The sale took place in New Orleans, and the negroes were afterwards taken from Wilkinson county in this state, and delivered in Louisiana. In payment for the negroes, Starke agreed to lift the five notes which Moore had given to the Merchants Bank. He accordingly made some arrangement with the bank, and procured an order on the Commercial Bank of Natchez for the notes, they having been deposited there for collection. This order was withheld from Moore, until he should relieve the negroes from some incumbrance. It was, however, ultimately delivered to him, and is now in the hands of his administrator, though the notes never have been delivered.
In October, 1839, the sheriff of Wilkinson county, by some stratagem, procured the negroes to be brought back to that county, and levied sundry executions on them, and was about proceeding to sell when this bill was filed. The judgments, with one exception, are younger than the first deed of trust given to Moise to secure the acceptors of the bills; and all but two, older than the deed given to Henderson to secure the bank; and.all older than the purchase by Starke. It is evident, therefore, that Starke cannot protect himself under his own purchase, because the judgments constitute prior liens. For the same reason he cannot rely on the deed given to Hen *128 derson to secure the bank. He therefore endeavors to shelter himself under the first deed, given to -secure his firm for their acceptances, and the question is, can he do so?
As a general rule, a mere change in the form of the evidence of indebtedness, will not operate to discharge a lien given to secure a debt, unless it is apparent that the parties intended to extinguish the lien. Whenever it is clear that the creditor still intended to retain it, his right is not affected by a mere change of the instrument, which is the evidence of the debt, as the debt itself is the thing for which the lien was given. But can Starke, who professes to have acquired a legal title, claim also under a prior equity ? A prior equity generally sinks or merges in a subsequently acquired legal title, but not so as to affect any valid lien. This is a legal consequence, and it will follow, unless there be some declared intent to prevent it, or some beneficial purpose to the holder not inconsistent with the rights of others. “ A court of equity will keep an incumbrance alive, or consider it extinguished, as will best serve the purposes of justice, and the actual and just intention of the party. It must, at all events, be an innocent purpose, and injurious to no one.” Starr v. Ellis, 6 John. C. R. 393. The facts in this case do not indicate anything like a design to keep the first incumbrance alive. On the contrary, the parties do not seem to have looked to that as constituting an available lien to the holders of the bills.
In the first place, Starke & Co. had accepted bills, and took a lien to save themselves harmless. The first bill they paid. They might have enforced the trust to that amount. They did not do so, but took a note for the amount, which they transferred to the Commercial Bank of Natchez. This note was either a payment of the debt, or it was not.' If it satisfied the debt as so much money would have done, then of course to that extent their lien was extinguished. If it did not satisfy the debt, then by transferring the note, they also transferred the lien. That they are liable as indorsers, does not entitle them to proceed on the lien until they pay the debt and take a reassignment. This is the condition of complainant with regard to the first bill.
*129 In regard to the other bills, as Starke & Co. did not pay them, they, of course, had no right to enforce the trust as to them. If any one had such right, it vested in Briggs, Lacoste & Co. as holders. They did not claim it. The security was not given to them. A bill in chancery was therefore requisite before they could avail themselves of the deed of trust. Suppose they could have done so, still a court of 'chancery will not force it on them. But if they were entitled to the benefit of the security, what became of that right in their arrangement with the bank ? It was either extinguished, or it was transferred. If it was transferred, the bank has either relinquished or still holds it. If it wais not extinguished by the bank in taking the notes of Moore, neither was it extinguished by taking the notes of Starke in exchange for those of Moore. Starke does not say that he paid the debt to the bank; and if the security is to be kept alive as long as the debt exists, it must of course be a security in the hands of the holder of the debt. Starke is therefore attempting to protect himself under the equities of others, which may never be asserted. On this view of the subject, Starke owes a debt to the bank, which is collaterally secured by a deed of trust, of which he of course can claim no benefit.
But the transaction with the bank looks very much like a waiver of any prior lien, if any existed. We must suppose that the deed of trust to Henderson to secure the five notes of Moore, was looked to and intended as the true and only security. Starke did not take an assignment of the incumbrances, or purchase them in. He purchased an incumbered property, giving no other price than the debt for which it was incumbered. This can be regarded in no other light than a payment. He purchased the incumbrance from the bank, if it existed, and gave it to' Moore for the thing incumbered. Starke now claims to be the owner of the property which was once incumbered, and in order to protect it, wishes to rely on the incumbrance, although no intention was manifested to keep it alive. On the contrary, every act in connection with this matter, seems to favor the idea that the original lien was abandoned. The bank relied upon the security of the deed of trust to Henderson, and *130 even refused to consummate the arrangement until the property-should be released from another deed of trust, which was subsequent to the original lien given to Starke. After all this, it is too late to resort to an equitable incumbrance which once existed, but which in fact has been discharged by payment.
The prayer is in the alternative, that if the relief should not be granted, then that the «contract between Starke and Moore be rescinded. There is no ground for a rescission; no allegation of fraud. Starke purchased with notice, and if his bargain has turned out to be an unfortunate one, that is no reason for its rescission. He had not only constructive notice of the judgment liens, but seems to have had actual notice. The whole transaction shows this — Moore made no false representations, nor did Starke labor under any deception from any source. He is consequently not entitled to have the contract rescinded.
Decree reversed.